# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| CHRISTINE NORRIS, ) | |
| ) | |
| Plaintiff, ) | No. 15 C 1494 |
| ) | |
| v. ) | |
| ) | Judge Edmond E. Chang |
| FRANCISCAN PHYSICIAN NETWORK / ) | |
| SPECIALTY PHYSICIANS OF ILLINOIS, ) | |
| CRAIG MILLER, NITA WIRKUS, ) | |
| SHEREE BOYD, and MICHELLE ) | |
| BURGIO, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

In October 2013, Christine Norris was summoned to active military duty. Norris asserts that when she returned to work a year later, she was demoted and subjected to a campaign of bullying and harassment based on hostility to her military service.[1] *See generally* R. 19, Am. Compl.[2] Norris filed this lawsuit claiming intentional infliction of emotional distress and violations of the Uniformed Services Employment and Reemployment Rights Act (USERRA), 38 U.S.C. § 4301 *et seq*. The Defendants—Norris's employer and various supervisors—moved for summary judgment. R. 61, SPI Mot. Summ. J.; R. 66, Indiv. Defs.' Mot. Summ. J.[3] For the reasons explained below, summary judgment is granted on all claims.

---

[1] The Court has jurisdiction over the USERRA claims under 28 U.S.C. § 1331, and supplemental jurisdiction over the state law claim under 28 U.S.C. § 1367.
[2] Citations to the record are "R." followed by the docket number and a page or paragraph number.
[3] Sealed versions of these motions were filed at R. 59 and R. 63, respectively.

1

# I. Background

In deciding the motions for summary judgment, the Court views the evidence in the light most favorable to Norris, the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Christine Norris is a captain in the United States Army. Am. Compl. ¶ 1. In 2012, she was hired by Defendant Specialty Physicians, Inc. ("SPI" for short) as a nurse practitioner. R. 62, SPI SOF ¶ 1.[4] Norris was initially assigned to the "Priority Patient First Clinic" (which the parties refer to as the "PPFC"). *Id.* ¶ 5. The PPFC is an urgent care clinic for patients who need same-day care. *Id.* ¶ 7. While Norris was assigned to the PPFC, she was the sole health care provider for the clinic. *Id.* ¶ 8. Norris asserts that she was recruited and hired specifically to open and run the PPFC. R. 74, PSOF ¶ 67.

In October 2013, Norris was called to active military duty. She was away from her job on military leave for a year, until late September 2014. Pl. Resp. SPI SOF ¶ 13.

---

[4]Citations to the parties' Local Rule 56.1 Statements of Facts are as follows: "SPI SOF" for Defendant Specialty Physicians' Statement of Facts [R. 62; sealed unredacted version at R. 60]; "Indiv. Defs.' SOF" for the Individual Defendants' Statement of Facts [R. 65]; "Pl. Resp. SPI SOF" and "Pl. Resp. Indiv. Defs.' SOF" for Norris's Responses to the defendants' respective Statements of Facts [R. 74 and R. 77, respectively; the sealed version of R. 74 can be found at R. 76]; "PSOF" for the Statement of Additional Facts offered along with Norris's Response to SPI's Statement of Facts [R. 74 and R. 76]; "Second PSOF" for the Statement of Additional Facts offered along with Norris's Response to the Individual Defendants' Statement of Facts [R. 77]; "SPI Resp. PSOF" for SPI's Response to Norris's Statement of Additional Facts [R. 83, sealed version at R. 81]; and "Indiv. Defs.' Resp. PSOF" for the Individual Defendants' Response to Norris's Statement of Additional Facts [R. 86].

## A. Retirement Account

In May 2014, while Norris was on military leave, her 401(k) account was terminated. PSOF ¶ 93. According to Norris, the account was not fully corrected and restored until March 2015. *Id.* Defendant Nita Wirkus, who was the head of human resources at SPI, was the one who terminated the account. R.77, Pl. Resp. Indiv. Defs.' SOF ¶ 15; R. 77, Second PSOF ¶¶ 46-47. SPI and Wirkus argue that the termination of the 401(k) was simply an administrative blunder caused by an internal decision to list Norris as "inactive" during her military leave, not knowing that would result in the 401(k) provider terminating the account. Indiv. Defs.' SOF ¶ 15. Norris disputes that version of the facts, and argues that the termination of the 401(k) was a malicious act of retaliation against her for taking military leave. Pl. Resp. Indiv. Defs.' SOF ¶ 15; R. 75, Pl. Resp. to SPI Br. at 8. Norris admits, however, that when she contacted SPI to inquire about the termination, they quickly sent an email marked "high importance" to try to resolve the issue. Pl. Resp. Indiv. Defs.' SOF ¶ 14. The Defendants argue that the issue was resolved within half an hour, but Norris asserts that the account was not fully restored for almost a year after that. *Id.*

## B. Assignment to the Family Practice Clinic

When Norris returned to her job at SPI after military leave, she was not returned to her former position at the PPFC. In fact, Norris assets that when she first reported to work after her absence, there was no job ready for her, and she waited in the human resources office for two days before receiving a job assignment. Pl. Resp. SPI SOF ¶ 20. When Norris finally got an assignment, it was not the one she wanted.

Instead of being assigned to the PPFC clinic, Norris was assigned to the Family Practice Clinic (which the parties abbreviate as "the FPC"). *Id.*

Norris saw her reassignment to the FPC as a demotion. PSOF ¶ 75. SPI disputes that the position at the FPC was inferior to the previously assigned clinic, and says that Norris actually got a raise when she was assigned to the FPC. SPI Resp. PSOF ¶ 75. But Norris points out that at the FPC she was only one of a group of family practice physicians at a clinic with multiple locations and provider options. PSOF ¶ 77. The PPFC (the prior clinic), on the other hand, was a standalone clinic run by a mid-level practitioner like Norris, and that mid-level practitioner was the only health care provider at the PPFC. PSOF ¶¶ 76-77. So from Norris's point of view, the FPC was a step down in terms of responsibility and independence.

Norris also contends that her assignment to the FPC was a step down in pay. Norris asserts that throughout her employment, she was eligible for a bonus of $15,000-$20,000 depending on how many patients she saw. PSOF ¶ 78. Norris argues that she had a greater opportunity to earn bonuses at the PPFC for two reasons. First, the PPFC had separate marketing materials, distributed to patients, and those materials featured Norris. PSOF ¶ 79. Second, Norris was the only provider at the PPFC, so all the patients that came into the clinic could only see Norris. *Id.* SPI argues, however, that the bonus program was eliminated for mid-level providers throughout the company before Norris returned from military service. SPI SOF ¶ 16; SPI SOF Exh. 17, Miller Aff. ¶ 3.

## C. Interference with Patient Scheduling

Norris avers that, once she was assigned to the FPC, SPI and its agents sabotaged her work by directing patients away from her and failing to advertise her availability as a care provider. For example, in November 2014, one of the physicians at the FPC, Dr. Luebbe, retired. *See* Pl. Resp. SPI SOF ¶ 23. SPI sent out a flyer discussing the retirement and listing providers that his patients could see for care in his absence. *Id*. The flyer did not list Norris's name. PSOF Exh. 10. SPI points out, however, that it later sent an electronic message to 200 of Dr. Luebbe's patients informing them that Norris was available for appointments and listing her contact information. SPI SOF ¶ 30.

In addition to the snafu over Dr. Luebbe's retirement, Norris alleges that SPI patient service representatives directed patients away from her by giving them misleading information about her ability to prescribe medication. PSOF ¶ 82; PSOF Exh. 20. Patients complained about being directed away from Norris, but Norris asserts that SPI—and in particular, individual Defendants Sheree Boyd and Craig Miller—failed to investigate the complaints. PSOF ¶¶ 82-83. The Defendants do not deny that some patient representatives directed patients away from Norris and gave out incorrect information about her prescription privileges. But SPI says that it took appropriate steps to respond to the problem, including educating the manager of the patient service representatives about the ability of mid-level providers to prescribe medication, and retraining the representatives to ensure that they knew to offer patients appointments with Norris. SPI SOF ¶¶ 28-29.

5

### D. Scheduling Complaints at the PPFC

In March 2015, Norris was restored to her position at the PPFC. SPI SOF ¶ 31. Unfortunately, the change in position did not alleviate the conflict between Norris and her employer. To the contrary, Norris asserts that the Defendants took steps to harass her by making her working conditions at the PPFC difficult. Specifically, Norris alleges that Defendant Michele Burgio scheduled Norris to see 6-7 patients per hour when SPI's policy only allowed 5 per hour. PSOF ¶¶ 86-87. The schedule set up by Burgio allowed Norris to be double-booked every 15 minutes, instead of once per hour, which was SPI's policy. PSOF ¶ 86. Norris maintains that her schedule was much busier than that of another provider at her level, and that she did not have comparable breaks in her schedule. PSOF ¶ 88.

Norris also argues that SPI interfered with her ability to attend school by refusing to change her work schedule to accommodate her evening class. PSOF ¶ 90. Before Norris went on military leave, SPI had accommodated her education by not requiring her to use paid time off to attend class. PSOF ¶ 89. At that time, Burgio would refrain from scheduling patients with Norris for the last time slot of the day, which allowed Norris to leave early for school. *Id*. But after Norris returned from military leave, SPI required Norris to use paid time off to attend class. PSOF ¶ 90. Norris tried repeatedly to negotiate a schedule that allowed her to attend class one night a week, but SPI did not allow Norris to adjust the schedule to accommodate her class. *Id*. ¶¶ 90-91.

### E. Disciplinary Actions and Eventual Departure

Apart from the problems with patient scheduling, Norris alleges that she received unfair discipline that caused her to feel harassed and to doubt her future employment with SPI. The first disciplinary action, dated March 17, 2015, was written counseling about Norris's work performance. SPI SOF ¶ 38. Norris says that the counseling was unfair because the underlying offense—moving a patient to another provider's schedule—was a permissible practice at her place of employment, and other providers did it as well. PSOF ¶ 94. SPI disagrees with that characterization, pointing out that the counseling was for "unsatisfactory work performance and insubordination," not just for moving the patient to another schedule. SPI Resp. PSOF ¶ 94. Norris denies that she was insubordinate. R. 76, PSOF Exh. 1, Norris Dep. at 157:11-158:14, 160:14-161:8 (sealed).[5]

Shortly after the written counseling, SPI sent Norris correspondence informing her that she was expected to work all clinic hours unless she used paid time off. SPI SOF ¶ 39. Despite two warnings along those lines, on March 30, Norris left work at 4:00 p.m. (which was within clinic hours) to attend class, even though Norris did not have PTO to cover the absence. SPI SOF ¶ 40. Norris received a written warning for leaving work early. *Id*. According to SPI policy, a written warning is the second-to-

---

[5]The parties proposed to seal the *entirety* of Norris's deposition. Although some of the deposition discusses private information, parts of it clearly do not meet the Seventh Circuit's standard for sealing. *See, e.g., Citizens First Nat. Bank of Princeton v. Cincinnati Ins. Co.*, 178 F.3d 943, 945 (7th Cir. 1999) (noting that judicial proceedings are presumptively open to the public unless the litigants' privacy and property interests predominate); *Cty. Materials Corp. v. Allan Block Corp.*, 502 F.3d 730, 740 (7th Cir. 2007) (same). The Court therefore decided to make some parts of the deposition public in this Opinion.

last step before termination. PSOF ¶ 92.

Norris resigned soon after receiving the written warning. *See* SPI SOF ¶ 1. Norris claims that she resigned because of "hostile work environment, feeling harassed, … working in fear, second guessing herself because she had received multiple write-ups, and that she was unable to provide good patient care in the circumstances she was placed under due to scheduling." PSOF ¶ 95.

## II. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden

is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

### A. Constructive Termination

First up is Norris's claim that she was constructively discharged from her employment at SPI based on hostility to her military service. A constructive discharge occurs when an employee is forced to resign because her working conditions, from the standpoint of a reasonable employee, had become unbearable. *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010). The Seventh Circuit recognizes two forms of constructive discharge. *Id.* The first form occurs when an employee resigns due to discriminatory harassment resulting in working conditions "even more egregious than that required for a hostile work environment claim." *Id.* The second form occurs "[w]hen an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated." *Id.* (quoting *EEOC v. Univ. of Chi. Hosps.*, 276 F.3d 326, 332 (7th Cir. 2002)) (alteration in original). Under either theory, the standard is very high: the plaintiff must show that the workplace had become objectively "intolerable." *Chapin*, 621 F.3d at 679.

A reasonable jury could not find for Norris on either theory of constructive discharge. First, Norris's evidence, even construed in the most generous light, is not enough to establish that Norris was subjected to egregious harassment. It is true that a reasonable jury could find that Norris was effectively demoted, that she was transferred to a less-pleasant job situation, and that her supervisors overscheduled

9

her and did not support her educational aspirations. But those incidents are nowhere near enough for a reasonable jury to conclude that Norris's work environment was egregiously hostile. The cases where the Seventh Circuit has found an "egregious" work environment usually involve extreme harassment, explicit or implicit threats to personal safety, or both. *See, e.g.*, *Taylor v. W. & S. Life Ins. Co.*, 966 F.2d 1188, 1198-99 (7th Cir. 1992) (jury could find constructive discharge where plaintiff's boss made constant racist comments and held a pistol to plaintiff's head); *Boumehdi v. Plastag Holdings, LLC,* 489 F.3d 781, 789-90 (jury could find constructive discharge where plaintiff was sexually harassed and demeaned by her supervisor and her employer failed to respond to repeated complaints). In contrast, the Seventh Circuit has held that mere transfer or demotion is *not* enough to show an "egregious" work environment; nor are worsened working conditions, loss of employment benefits, or unfair reprimands. *See, e.g.*, *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 366 (7th Cir. 2009) ("It is entirely implausible to suggest that a transfer from editorial writing to copy editing was enough to make [the plaintiff's] working conditions 'unbearable.'"); *Harriston v. Chi. Tribune Co.*, 992 F.2d 697, 705 (7th Cir. 1993) (jury could not find constructive discharge when plaintiff was excluded from office activities, unfairly reprimanded, assigned undesirable sales territory, denied new accounts, barred from supervising two white employees, and refused assistance from her boss); *Fugate v. Dolgencorp, LLC*, 555 F. App'x 600, 605-06 (7th Cir. 2014) (non-precedential disposition) (manager's unfair criticisms, allegedly unfounded disciplinary actions, and boorish remarks were not enough to support constructive

discharge claim). Norris's evidence falls well short of what would be needed to allow a reasonable jury to find constructive discharge based on harassment.

Norris's evidence is also not enough to establish that a reasonable employee would have believed that termination was imminent. This second form of constructive discharge occurs when "based on an employer[']s actions, the handwriting was on the wall and the axe was about to fall." *Fischer v. Avanade, Inc.*, 519 F.3d 393, 409 (7th Cir. 2008) (cleaned up).[6] "A person who is told repeatedly that [s]he is not wanted, has no future, and can't count on ever getting another raise would not be acting unreasonably if [s]he decided that to remain with [her] employer would necessarily be inconsistent with even a minimal sense of self-respect, and therefore intolerable." *Hunt v. City of Markham, Ill.*, 219 F.3d 649, 655 (7th Cir. 2000). But in Norris's case, a reasonable jury could not conclude that the "handwriting was on the wall." It is true that Norris received two reprimands in the month before she left her job, and Norris believes that those reprimands were unfair. But the two reprimands—even coupled with the other harassment that Norris supposedly faced—are not enough to show that a firing was imminent. The written warning that Norris received days before her resignation was only the second step of three in SPI's progressive discipline policy; if SPI was following its manual (and there is no evidence to the contrary), Norris was not actually very close to termination. PSOF Exh. 22, SPI Corrective Action Policy. Indeed, the Seventh Circuit has held that even more advanced disciplinary

---

[6]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

11

proceedings are not enough to survive summary judgment on a constructive discharge claim. *See, e.g.*, *Levenstein v. Salafsky*, 414 F.3d 767, 774-75 (7th Cir. 2005) (professor who was suspended for months pending a sexual assault investigation, removed as department head, and given "demeaning" tasks before resigning was not constructively discharged); *Swearnigen-El v. Cook County Sheriff's Dept.*, 602 F.3d 852, 860 (7th. Cir. 2010) (employee's suspension with pay pending *Loudermill* hearing was not enough for a reasonable jury to find constructive discharge). And even if Norris *was* somewhere on the road to termination, the mere possibility of eventual termination is not enough to establish constructive discharge. *Chapin*, 621 F.3d at 679 ("[A] working condition does not become intolerable or unbearable merely because a prospect of discharge lurks in the background.") (quoting *Cigan v. Chippewa Falls Sch. Dist.*, 388 F.3d 331, 333 (7th Cir. 2004)) (cleaned up).

To sum up, the working conditions Norris describes are simply not enough for a reasonable jury to conclude that Norris's employment had become "intolerable" under either theory of constructive discharge. Summary judgment is granted to SPI and to the Individual Defendants on the constructive discharge claim.[7]

### B. Intentional Infliction of Emotional Distress

Next is Norris's state-law claim for intentional infliction of emotional distress. To succeed on an emotional-distress claim, a plaintiff must establish (1) that the defendant's conduct was extreme and outrageous; (2) that the defendant knew that

---

[7]There is no need to break down which individual defendant was responsible for what; even assuming that all the defendants acted in concert (and therefore can be held responsible for each other's actions), Norris's evidence falls short of the mark.

there was a high probability that his conduct would cause severe emotional distress; and (3) that the conduct in fact caused severe emotional distress. *Bianchi v. McQueen*, 58 N.E.3d 680, 699 (Ill. App. Ct. 2016). "[M]ere insults, indignities, threats, annoyances, petty oppressions or trivialities" do not constitute extreme and outrageous conduct. *Id*. at 700 (quoting *Public Finance Corp. v. Davis*, 360 N.E.2d 765, 767 (Ill. 1976)). To meet the high bar for "extreme and outrageous" conduct, the defendant's conduct must be "so extreme as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community." *Kolegas v. Heftel Broadcasting Corp.*, 607 N.E.2d 201, 211 (Ill. 1992).

In this case, a jury could not conclude that any defendant's conduct was beyond all possible bounds of decency. As discussed above, Norris's evidence is enough to prove that she was given a less-favorable job assignment, that she was overworked, that she was unfairly disciplined, that her 401(k) was temporarily disrupted, and that she was not allowed to change her work schedule to pursue her education. Based on that evidence, a reasonable jury could conclude that the Defendants' conduct was frustrating, inept, and perhaps even harassing—but not that the Defendants' conduct was "intolerable in a civilized community." Indeed, as SPI points out, Illinois courts have been reluctant to allow emotional-distress claims based on employment disputes in all but extreme cases: "if the anxiety and stress resulting from discipline, job transfers, or even terminations could form the basis of an action for emotional distress, virtually every employee would have a cause of action." *Welsh v. Commonwealth Edison Co.*, 713 N.E.2d 679, 684 (Ill. App. Ct. 1999); *see also, e.g.,*

13

*Miller v. Equitable Life Assur. Soc. of the U.S.*, 537 N.E.2d 887, 889 (Ill. App. Ct. 1989). The employment-related distress that Norris experienced after her return from military leave—though undoubtedly unpleasant—simply does not even arguably rise to the level of "extreme and outrageous" conduct. So, because no jury could reasonably conclude that any defendant's conduct was extreme and outrageous, summary judgment is granted on this claim.[8]

### C. Other USERRA Claims

Last are Norris's remaining claims under USERRA. As a starting point, SPI and the individual defendants argue that Norris does not actually have any other USERRA claims, because her Amended Complaint appears to characterize all the allegations as parts of the constructive discharge claim. R. 84, SPI Reply at 1 n.1; R. 87, Indiv. Defs.' Reply at 2 (joining in SPI's reply). That is not entirely correct. Although Count One of the Amended Complaint foregrounds the constructive discharge theory, the Amended Complaint also cites USERRA's general nondiscrimination and reemployment provisions. *See* Am. Compl. ¶ 59. The allegations in the Amended Complaint can fairly be read to advance a USERRA claim based on failure to reemploy or retaliation.

Still, those claims cannot survive summary judgment. USERRA does not authorize damages for emotional distress. The remedies under USERRA are limited to (A) a court order requiring the employer to comply with USERRA; (B)

---

[8]Again, it is unnecessary to sort out the conspiracy allegations. As with the constructive discharge claim, the emotional-distress claim would fail even assuming that the individual defendants all conspired together.

14

compensation for "any loss of wages or benefits"; and (C) liquidated damages for willful violations, equal to the amount of lost wages or benefits. 38 U.S.C. § 4323(d). Norris is no longer employed at SPI, and her 401(k) and former position were restored to her before she left SPI, so there is no live claim for injunctive relief ordering USERRA compliance.

As for damages, there are no disputed issues of fact: Norris cannot prove "any loss of wages or benefits." As discussed, Norris's 401(k) was fully restored before she left SPI. Norris also agrees that there was no difference in salary between the FPC and the PPFC. *See* Pl. Resp. SPI SOF ¶ 22. Norris claims that she lost earnings at the FPC because she lost the opportunity to earn a productivity bonus based on the number of patients she saw. But Defendants presented undisputed evidence from SPI Executive Director Craig Miller that the productivity bonus program was eliminated for all mid-level providers before Norris returned from military service. SPI SOF ¶ 16; SPI SOF Exh. 17, Miller Aff. ¶ 3. Norris purports to dispute that testimony, but her evidence boils down to (1) her own testimony that she felt that she was entitled to a bonus and (2) the fact that she received a bonus in 2013 and 2015. Pl. Resp. SPI SOF ¶ 16. PSOF Exh. 9. Norris's testimony demonstrates that she has no real personal knowledge of whether or not SPI's bonus program was discontinued in 2014. *See* PSOF Exh. 1, Norris Dep. at 123:25-125:10 ("Q: Can you say one way or another whether there was a bonus program after early 2014 for SPI mid-level employees? A: I was on military duty. I would not know.") (sealed). The most Norris could say was that she did not remember being told that the bonus program had been discontinued.

15

*See id*. at 124:7-125:4 (sealed). It would not be reasonable for a jury to credit Norris's assertions about her bonus entitlement over Miller's sworn testimony based on his first-hand knowledge about SPI's bonus structure. Norris's 2013 bonus is not relevant to the question whether she was entitled to a productivity bonus in after she returned from military leave in 2014. As for the bonus Norris received in 2015, there is no evidence whatsoever to establish that that bonus was tied to productivity—and therefore no basis to infer that Norris lost out on earning opportunities as a result of her placement at the FPC.

Finally, although Norris appears to be asserting that her ability to attend class without using paid time off was an employment "benefit," *see* Pl. Resp. SPI SOF ¶ 22, Norris does not point to evidence that her work at SPI prevented her from attending class or caused her to lose her tuition deposit. In fact, Norris agrees that she opted to leave work to attend her class and received a written warning as a consequence. *Id*. ¶¶ 39-40.

In short, with the constructive discharge claim out of the picture, Norris has no evidence of lost wages or benefits, and so cannot recover anything based on her remaining USERRA claims. Summary judgment is granted across the board on all claims.[9]

---

[9]Norris might argue that the Defendants have waived summary judgment on any other USERRA claims. But, as Norris acknowledges, the Defendants moved for summary judgment on all of Norris's claims. R. 61, SPI Mot. Summ. J. at 1 (moving for summary judgment "on Plaintiff's claims in their entirety"; R. 63, Indiv. Defs.' Br. at 1 (same); R. 75, Pl. Resp. SPI Mot. at 1-2. What's more, most of the arguments that the Defendants would have made on the other USERRA claims are subsumed within their arguments regarding constructive discharge, so Norris has had a fair opportunity to present her evidence. In

16

## IV. Conclusion

For the reasons stated above, summary judgment is granted to each Defendant on all claims. As important as the protections of USERRA undoubtedly are, the evidence is insufficient to get to trial in this particular case. The status hearing of September 20, 2018 is vacated. Final judgment will be entered.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 4, 2018

---

particular, the issues about compensation and benefits (which ended up disposing of the other USERRA claims) were argued as part of the constructive discharge claim.